1, 2, 7, 2, United States v. Romilly Dastinot Good morning, Ms. Darnahill. Good morning, Judge Shoya, Judge Saliha, Judge Kayada. I may please the court. I'd ask for you to reserve two minutes time at the end. There must be a remedy when an affidavit in support of a wiretap application is filed with the court by a law enforcement agent and when there are misstatements and omissions in that affidavit. And then when the defendant presents evidence, presents argument, pointing out those misstatements and omissions, and then the district court nevertheless embraces the affidavit. The First Circuit has consistently held that that mechanism is a Franks hearing. We argue that this court should suppress the wiretap set issue based on a clear error by the court below, but failing that, we ask for a remand for a Franks hearing. Some circuits do provide for a less deferential standard of review for the denial of a motion to suppress, but this court doesn't, and indeed has made it very clear that the Franks hearing is the only appropriate mechanism for challenges to wiretap authorizations. Yet the district court precipitously dismissed our request, our motion to suppress, and our request for a Franks hearing, leaving my client completely without a remedy. So in paragraph 175 of the February 24, 2014 affidavit filed by Agent Brown, there are misstatements and omissions as to the utility of the precise location information and other surveillance techniques that could have aided in tracking, locating, gathering information about the individual's isolating sources of supply. The appellant highlighted that issue for the district court, but the district court summarily dismissed those arguments, relying on the affidavit itself as the countervailing evidence. So in essence, even though it is common knowledge, even though that knowledge in case through case law and congressional testimony was presented to district court, if law enforcement claims that they can track us using our phones in an affidavit, then the court held that the prevailing knowledge to the contrary must be false. So if the sky is blue, but law enforcement introduces a paragraph in their affidavit saying that the sky is green, and then the defendant says the sky is blue, but then the court says that the sky is green, where does the defendant go? What is the remedy? But this isn't a blue or green situation. This is a situation where the color is much more muted, and it is subject to opinion and application, right? Now, the relative utility of that data is clearly open to question. For example, cell site data in certain metropolitan locations doesn't accomplish the real purposes of an investigation like this if, for example, you're talking about a city that has many tenement houses and apartment houses, multiple family dwellings. Well, I think... And Boston is such a city. It is. It is. And Lewiston arguably is, too. But I do think that the cell site data is increasingly more precise. I mean, I think that that's... I mean, that's true. It's more precise, but it doesn't, in an investigation where they're looking for sources of supply, right? What I'm trying to get across to you is that it's not unreasonable to say that there may be two different opinions about the utility of that data. That's a far cry from saying that a person voicing one of those two opinions has made a knowingly false statement. I think... And your point is well taken. However, I do think that the evolution of modern surveillance technology is so rapid and is reflected in Stacey Earle's, for example, New Jersey case, in the Blaze testimony cited in the record below, in myriad other kind of snippets of ray, pen register, and trap trace device with cell location authority. It is evolving so rapidly. It has evolved so rapidly. And the defendant presented case law demonstrating that judges have accepted that, in fact, it is sufficiently precise to locate an individual in a dwelling. That's true, but that still doesn't prove it's a matter of fact rather than a matter of opinion. And certainly doesn't prove that a statement to the contrary is knowingly false. Wasn't his statement that he couldn't get precise location available from... Wasn't that his statement? It was. It was, yes. Isn't that, in fact, true? There's a lot of... It just depends what you mean by precise, right? Right. I think that's correct. So this, as Judge Selye is saying, this doesn't sound like the sort of lie in an affidavit that causes us to then view it as the 13th chime of the clock and start questioning everything we heard before. But it is a situation in which a Frank's hearing is warranted because of the omission, because of the nature of the omission, because technology is so vast... What's the omission? The omission is omitting the other surveillance techniques, the other surveillance technology that could have been used to sufficiently accurately track... He didn't omit anything. He said he thought it wasn't sufficiently precise. It's not that he didn't consider it. It's not that he lied about its existence. It's that his opinion as to the precision or utility of that surveillance technique or that available technology is different than yours. But then when the defendant presented evidence to the contrary, and instead of that evidence being lent any credence, instead of being able to avail ourselves of the Frank's hearing, the district court judge simply embraced the affidavit wholeheartedly without any interrogation. And it is, I mean, my cell phone is tracking, it's off right now, but my cell phone can track me to this moment, to this courtroom, and Verizon has the ability to get that. The apps on our cell phones are customizable. But we would not know what you were saying by way of the GPS. As he said in his affidavit, precise location information can't tell you who you're meeting with, who you're talking to, what you're saying. Yes, there are other surveillance technologies that can do that. For example, these sting rays that build off of the signal that's emitted by the cell phone to tell you who the cell phone is interacting with on a constant basis.  Yes, well, there is argument to that effect. There is argument, yeah. There is the Verizon document presented by counsel below. Which the district court reviewed and considered. He did, but the district court did review that. The district court, however, did not review the case law and the offers of proof through congressional testimony offered by defense counsel. How about miniature drones with listening devices? Should they have had to show, should they have had to use those first? I mean, at some point here. Right. Here. Right, but we almost seem immune to the listening in component of this. To the total abrogation of our Fourth Amendment rights. You know, that's what this is about. This is about the fact that the government has learned how to draft. Because the government drafts these affidavits and then they get through. And we have just become immune to the power of that intrusion into our privacy right. Thank you. Thank you. Good morning again. May it please the court, Renee Bunker again on behalf of the United States. Had we not had this live, real-time recording, we would not know precisely what Mr. The case law is clear that the government is not required to exhaust every available means of surveillance before resorting to a wiretap. Nor did this year-long investigation or these investigators dive headfirst immediately into a wiretap. They used a number of investigative tools, which Agent Brown spelled out in his 88-page affidavit, which I agree, Judge Gallagher, it left nothing out. Or Judge Talia, it left, it certainly didn't omit material information about what the agent's training and experience informed him, in addition to consult with other agents about the, after spelling out all of the other, the cooperating sources, the cooperating defendants, the controlled drug purchases that have been done, the surveillance, the pen registers, the track and trace, the historical text search warrant, all of the other means that had been tried. It's not as though we jumped right to the cell site information, but in paragraph 175 of Agent Brown's affidavit, he stated that based on my training and experience and conversations with other law enforcement, Verizon does not make precise location data available to law enforcement. In fact, and then he went on to say I could also obtain cell site information, but in my opinion, it's not sufficiently, it won't get us to the target sources of this, sources of supply of this organization. He spelled that out in paragraph 176. And the document that the government then obtained from Verizon, page 78 of Das Neues Appendix, it's from Verizon itself, and it said, it's in the record, it said that when it does, it's a disclaimer that it provides when it does provide law enforcement with location information. And that disclaimer makes it abundantly clear that their location information is cell site, from phones pinging towers, and that it's not, quote, it's that rather than precise location data. So it was certainly no error on the district court's part to conclude that Brown, therefore, certainly didn't make a knowingly or intentionally false statement on that issue. And, in fact, based on the evidence before the court, it was true. And so there would have been, again, no showing that that certainly wouldn't have required a Franks hearing. And then getting to the point that the court has raised today, even assuming that there was, that that statement was false or recklessly false, which we submitted was not, but even assuming that would by no means have negated the strong necessity showing that was made in this case because, as Dr. David itself pointed out, and the district court, and common sense, and the various objectives, reasonable objectives, as this court in Martin has pointed out, concrete, certainly reasonable to be working upstream or to the core of the conspiracy. It wouldn't have shown, to follow Victor and Dastan around, they had other people bringing the drugs from Massachusetts to Maine. So following them around certainly wouldn't have enabled knowing when a transaction was about to transpire. Knowing where phones are pinging in a group of, in some residence, certainly wouldn't have allowed the agents to discern what the topic of the conversation was, who was talking, who was agreeing to do what, and when the next shipment was coming. In fact, it was the wiretap that then allowed the stop that happened that was just the discussion of the earlier case, Mr. Resor, and seizure of 1,000 plus oxycodone pills coming to Maine for distribution. It was the wiretap intercept that allowed the stop discussed in the record of Farley and Buntrock in a separate seizure where Heron was seized. And it was the wiretap that allowed the stop of Valverne. If we stand back and look at the case law, is it fair to say that it seems to ultimately lead us to the conclusion that in every single ongoing conspiracy case, 100% of them, as long as the government does its spade work of first using some other techniques, it can always get a wiretap because it can always say that there's some additional relevant information that would be helpful to the prosecution into defining the who's and the conspiracy and what they're doing that you can't get without a wiretap. So I think, Judge Cahill, that gets to the objective. The objective is that the investigations are so broad that the wiretap will be inevitable, or it's such an ordinary objective. But I think the case law doesn't support that. So give me an example of a conspiracy where no matter how hard you worked before, you couldn't get a wiretap. Where you have identified some of the major sources of supply of your targets would be one. But you don't know who else they're getting it from because there's always an upstream buyer. Right, and it's not like this case we were trying to track down or take down or dismantle a Mexican cartel. You could say in every one of those drug cases, you found out who that seller is, but now you want to know who the seller of the seller is and the seller of the seller of the seller. You could, but that's not what happened here. And Martinez, I think, is a good, and Lopez discusses those cases. It's a case by case. It's actually application by application analysis. Again, this wiretap didn't go on forever like that. It went on from February to early May. And so it's not the uniqueness. The Martinez case has a good discussion of this. I think Judge Tilly, you may have authored that. Necessity is a function of the specifics of the case, not its uniqueness. So that it's quite normal to be working upstream to identify sources of supply is not necessarily the litmus test. And I might point out that nor is the fact that my opponent just suggested that there's some just egregious violation that these affidavits applications are more often than not approved by a court. The review process within the Department of Justice is in the Department's Office of Enforcement Operations. It's quite rigid and it's formalized. It's in writing. It's not like random prosecutors can just go to a judge and request a wiretap. There's often several layers of review. And so it's not surprising in the government's view that with that threshold level of scrutiny, that more applications than not are and therefore hopefully are authorized. And that's hopefully because of that threshold level of scrutiny where the necessity has been described and the history of the investigation and the other alternative investigative tools has been set forth here in an 88-page affidavit sufficiently to allow an independent judge to make the decision. With that, if there are any other questions, if there aren't any other questions, we'd ask that you affirm. Thank you. Fourth Amendment jurisprudence must keep pace with advances in technology. That's clear. That's in burger when they anticipate that this is a dirty business and that we're going to need to keep pace. That's been anticipated. You know, there was, in fact, a lot of evidence developed in the case as the investigation proceeded that, as Attorney McCaul suggested, we didn't need to know everything that everyone said. We didn't need to take that step of wiretapping. There were other means of tracking the defendant's whereabouts. There are other technologies available that can ping off of those cell phones, the signals radiated by the cell phone to access the other cell phones with whom those cell phones are communicating. There are other things that can be done. Law enforcement can't, on the one hand, minimize the utility of those technologies while simultaneously reaping its benefits. And Dastanow made a substantial showing that Brown's disregard for the GPS and the cell site data, as well as other technologies, was reckless in the face of common sense, in the face of the public knowledge about surveillance technology. If the court is bound by precedent and can only review for clear error and then the district court denies this frank hearing solely on the basis of the very statements that a defendant contends are false and misleading, then the defendant is left without recourse. This court has said repeatedly that a frank hearing is our recourse. Defendants need to have a remedy. They need to be able to access the remedy that this court has put forward. Thank you very much. If there are no further questions. Thank you.